## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                No. CR 13-0772 RB

JUAN FRANCISCO VASQUEZ-HERNANDEZ,

      Defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
### ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

**THIS MATTER** is before the Court on Defendant's Motion to Suppress Evidence and Statements, filed April 11, 2013. (Doc. 18). Having carefully considered the submissions of counsel and the evidence adduced at the May 28, 2013 hearing, and being otherwise fully advised, the Court **GRANTS** Defendant's motion.

### FINDINGS OF FACT

Federal Rule of Criminal Procedure 12(d) provides that when factual issues are involved in deciding a motion, the Court must state its essential findings on the record. The Court makes the following factual findings based on the evidence adduced at the evidentiary hearing, including the testimony from Mesilla Deputy Marshal Nick Hervol, Jr., and United States Border Patrol Agents Adam Meza, Victor Ramirez, and John Elmore.

1. On December 11, 2012, Deputy Hervol, who has been a Mesilla Deputy Marshal for three and a half years, and Reserve Deputy Isaac Martinez were on patrol in Mesilla, New Mexico. The deputies parked at Shorty's gas station on Avenida de Mesilla and

observed Defendant's vehicle, a white Chevrolet Astro van with a New Mexico license plate, in the parking lot.

2.  The vehicle displayed an elaborate graphic that advertised a mobile car detailing business. Displayed prominently on the vehicle was a contact telephone number with an El Paso, Texas area code. The graphic covered three sides of the vehicle. From the video, on which the rear of the vehicle is visible, it is clear that the graphic depicts a car wash. It covers the entire visible portion of the vehicle, including the rear windows.

3.  Deputy Hervol observed two Hispanic males in the vehicle, and he decided to continue observing the van, waiting for it to leave the parking lot. He found it odd that an auto detailing business with an El Paso area code would be in Mesilla. Deputy Hervol testified that he intended to run the license plate after the vehicle departed.

4.  After a few minutes, the vehicle had not left the parking lot, and Deputy Hervol decided to depart from the gas station. Shortly thereafter, he saw the vehicle driving on Calle de El Paso. Deputy Hervol caught up to the vehicle, contacted dispatch, and asked dispatch to run the license plate number.

5.  The dispatcher reported that the license plate was registered to a Chevrolet truck owned by Betty Vasquez of 216 Mora Lane in Sunland Park, New Mexico. Deputy Hervol reconfirmed with dispatch that the registration belonged to a truck. He found this notable because the vehicle was a van.

6.  At the hearing, Deputy Hervol testified on two occasions that the registration came back for a pick-up truck. However, elsewhere, including in his report and in his testimony, Deputy Hervol stated that the registration came back to a truck. Indeed, when confronted with the discrepancy by defense counsel, Deputy Hervol conceded that the registration

2

came back to a truck, rather than a pick-up truck. The Court gives no credence to Deputy
Hervol's statements referencing a pick-up truck.

7. At approximately 9:07 a.m., Deputy Hervol conducted a traffic stop of the vehicle on
Calle de El Paso near Glass Road based on the purported registration violation. There is
footage of the entire stop from this point forward, as a videocamera mounted on the
patrol vehicle's dashboard, a microphone in the patrol vehicle, and a microphone on
Deputy Hervol's belt turned on automatically when Deputy Hervol activated the
emergency equipment.

8. Both deputies approached the vehicle on the passenger side. Deputy Hervol explained to
Defendant that the license plate was registered to a "Chevy pick-up" belonging to a
woman in Sunland Park. Deputy Hervol asked Defendant for his driver's license.
Defendant responded that he had a license but did not have it with him. Deputy Hervol
asked Defendant for the registration and proof of insurance, which Defendant produced.

9. Deputy Hervol then asked the front passenger for identification, and the front passenger
responded that he did not have a driver's license. A passenger in the rear of the van
volunteered that he had a driver's license.

10. Deputy Hervol asked Defendant for his name, his date of birth, and the state that issued
his driver's license. Defendant told Deputy Hervol that his name was "Juan Francisco
Vasquez," his date of birth was May 15, 1983, and he had a New Mexico driver's license.

11. At 9:11 a.m., Deputy Hervol asked dispatch to run Defendant's name and date of birth in
order to determine whether Defendant had a driver's license. He confirmed that the
registration and insurance for the van were valid. As to the registration, Deputy Hervol
again noted that the license plate came back to a truck, stating, "That's kind of weird.

I've never seen a van come back like that." Within seconds, Deputy Hervol identified that the registration as a truck was proper, stating, "Oh there it is – Chevy truck Astro cargo van."

12. At 9:14 a.m., dispatch advised Deputy Hervol that Defendant was coming back "not on file" and the passenger came back with an outstanding warrant.

13. Deputy Hervol returned to the van and requested Defendant's social security number. Defendant provided an eight digit number. Deputy Hervol asked dispatch to run the number. While the number was running, Deputy Hervol advised Deputy Martinez of his plan to have the van towed in order to conduct an inventory search.

14. At 9:25 a.m., dispatch advised Deputy Hervol that Defendant was still returning "not on file," even with the social security number. Deputy Hervol requested a tow truck and a Border Patrol agent at that time. He told Deputy Martinez, "That guy is not who he says he is, so we're going to take him to Border Patrol."

15. The deputies approached the van for the third time at 9:26 a.m. They approached from the passenger side and placed the front passenger under arrest based on the outstanding warrant. The front passenger was patted down, handcuffed and seated in the rear of Deputy Hervol's patrol vehicle.

16. Deputy Hervol then approached from the driver's side and asked Defendant to step out of the car. He advised Defendant that his name, date of birth, and social security number did not come back and repeatedly asked Defendant whether he was a United States citizen. Defendant insisted that he was a citizen and advised that the driver's license could also be under the last name of "Hernandez," explaining that "Hernandez" is his mother's last name.

4

17. At 9:30 a.m., Deputy Hervol informed Defendant that he was being placed in detention, patted him down, put him in handcuffs, and seated Defendant in the rear of his patrol vehicle. However, Deputy Hervol further told Defendant that he was not under arrest.

18. Deputy Hervol advised the rear passenger that he was free to leave at 9:31 a.m. However, Deputy Hervol did not allow the passenger drive away in the vehicle. Because Deputy Hervol informed him that he could not take the vehicle, the rear passenger left the scene on foot.

19. The tow truck arrived approximately ten minutes after Defendant was placed in the patrol car.

20. At 9:48 a.m., over forty minutes after Deputy Hervol initiated the stop, Defendant's van was towed.

21. Deputy Hervol relocated his patrol car a short distance, from Calle de El Paso to Glass Road.

22. While awaiting the arrival of the Border Patrol, Deputy Hervol warned Defendant, "If Border Patrol rolls your prints, and you come back as somebody else, I'm going to charge you with concealing identity."

23. In response to further questioning by Deputy Hervol, Defendant informed Deputy Hervol that he was born in California. At 9:54 a.m., Deputy Hervol asked dispatch to run Defendant through a California database.

24. At 9:56 a.m., Agent Meza for the United States Border Patrol arrived at the scene. The video demonstrates that Defendant was in the rear of Deputy Hervol's patrol vehicle and that the van had already been towed at the time of Agent Meza's arrival.

25. Agent Meza testified at the hearing on May 28, 2013. His memory did not accurately reflect the events of December 11, 2012. Specifically, he stated that Defendant was in the van when he arrived on scene and that the van was either maroon or white. To his credit, Agent Meza did admit that he could not remember portions of the events in question. However, facts to which Agent Meza attested are disproven by the video. As such, the Court does not find Agent Meza's testimony credible.

26. At 9:58 a.m., dispatch advised Deputy Hervol that a California identification number was associated with Defendant's name and date of birth. Deputy Hervol provided that information to Agent Meza, in addition to advising him of the circumstances of the stop and the information provided by Defendant. Deputy Hervol also informed Agent Meza that Defendant was "not under arrest, he's just in detention."

27. At 10:01 a.m., fifty-five minutes after Deputy Hervol initiated the stop, Defendant was removed from the patrol car and handed over to Agent Meza. Agent Meza began questioning Defendant about his citizenship and place of birth. During the course of this transfer, Deputy Hervol testified that his handcuffs were removed from Defendant's wrists as Agent Meza placed Defendant in a different set of handcuffs. Agent Meza testified that he was unsure whether he placed Defendant in handcuffs. For the reasons above, the Court does not credit Agent Meza's testimony. The Court deems Deputy Hervol's testimony on this point credible and finds that Defendant was in handcuffs from the time he was placed in the rear of Deputy Hervol's vehicle through his arrival at the Border Patrol station.

28. Agent Meza seated Defendant in the rear of his patrol vehicle.

29. In the course of his interaction with Deputy Hervol and Defendant at the scene, Agent Meza repeatedly stated that, because Defendant's identity and truthfulness with the officers was in question, they would roll his prints at the Border Patrol station.

30. At approximately 10:20 a.m., Agent Meza transported Defendant to the Border Patrol station. At the Border Patrol station, Agent Meza rolled Defendant's fingerprints and ran them through a machine that identifies immigration and criminal histories based on fingerprint data.

31. From his fingerprints, Agent Meza learned that Defendant had been administratively deported as an aggravated felon. Specifically, Defendant's prints came back associated with the name and date of birth that Defendant provided to the officers, as well as an alien file ("A-file"). The obtained information further revealed that Defendant was deported in September 2006 based on an aggravated felony committed in El Paso, Texas.

32. While awaiting the outcome of the fingerprint analysis, Defendant was placed in a holding cell at the station.

33. After the information came back, Agent Ramirez, a desk supervisor with eight years of experience with the Border Patrol, entered the holding cell. Agent Ramirez knew that Defendant had previously been deported as an aggravated felon. Agent Ramirez testified that the Border Patrol does not prosecute everyone and that there is a possibility that a person could be handled administratively. However, Agent Ramirez testified that the Border Patrol does prosecute all persons who are aggravated felons with a prior removal.

34. Agent Ramirez questioned Defendant about his immigration status. In response to Agent Ramirez's questioning, and in less than five minutes, Defendant admitted that he was in the country illegally.

35. Agent Ramirez did not make promises or threats to Defendant, and Defendant seemed to understand English well and to have some education. He did not appear to be impaired.

36. To this point, Defendant had not been advised of his *Miranda* rights by any law enforcement officer.

37. Defendant was finally advised of his *Miranda* rights by Agent Elmore at 12:15 p.m., nearly two hours after Agent Meza transported him to the Border Patrol station. Defendant promptly invoked his right to counsel. After that, additional information was gathered from Defendant including his name, age, date of birth, place of birth, and prior deportation.

38. At some point after Defendant admitted to being in the country illegally pursuant to Agent Ramirez's questioning, Agent Meza contacted Deputy Hervol on Deputy Hervol's cellphone. Agent Meza told Deputy Hervol, "We broke him."

39. Ultimately, Defendant was charged with re-entry of a removed alien, in violation of 8 U.S.C. §§ 1326(a) and (b).

#### LEGAL STANDARDS AND CONCLUSIONS OF LAW

Defendant moves to suppress all physical evidence and statements obtained as a result of the seizure on December 11, 2012, including his fingerprints and A-file. (Doc. 18). In support of the motion, he contends that (1) the initial stop of his vehicle was not supported by probable cause or reasonable suspicion; (2) his seizure pursuant to the initial stop was unreasonably prolonged; (3) he was arrested without probable cause; and (4) he was subjected to custodial interrogation before being advised of his *Miranda* rights. The United States responds that the officers had reasonable suspicion to stop and detain Defendant and that the officers timely advised him of his rights. (Doc. 19).

I.      **The Stop of Defendant's Vehicle Was Not Justified at Its Inception.**

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. "The basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Id.* The United States bears the burden to demonstrate by a preponderance of the evidence that the seizure was justified. *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012) (citation omitted).

When an officer initiates a routine stop for an observed traffic violation, the constitutionality of the seizure is analyzed pursuant to a two-prong test. *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). The first inquiry is whether the stop was justified at its inception by "either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008) (citing *United States v. Ozbirn*, 189 F.3d 1194, 1197-98 (10th Cir. 1999)) (internal quotation marks omitted). The second inquiry is whether the officer's actions were reasonably related in scope to the circumstances that justified the interference in the first place. *United States v. Sanchez*, 519 F.3d 1208, 1213 (10th Cir. 2008) (citation omitted).

Deputy Hervol initiated the stop of Defendant's vehicle based on his purported suspicion that the license plate belonged to another vehicle. In New Mexico, it is an offense under the motor vehicles code to display a registration issued to one vehicle on a different vehicle. N.M. STAT. ANN. § 66-8-2. Here, the registration check revealed that the vehicle in question was a truck. The motor vehicles code defines a truck as any "motor vehicle designed, used or

maintained primarily for the transportation of property . . . ." N.M. STAT. ANN. § 66-1-4.17(Q). Shortly after initiating the traffic stop, Deputy Hervol determined that the registration on Defendant's vehicle was proper and that the vehicle was classified as a truck.

Though reasonable suspicion may be based on an officer's objectively reasonable mistake of fact, it cannot be based on a mistake of law. *United States v. Pena-Montes*, 589 F.3d 1048, 1054 (10th Cir. 2009) (quoting *United States v. DeGasso*, 369 F.3d 1139, 1144 (10th Cir. 2004)). The Government contends that Deputy Hervol's mistake was one of fact because the registration of a van depends on its use. *See* N.M. STAT. ANN. § 66-1-4.17(Q). The Court, however, concludes that the mistake was one of law. Deputy Hervol testified that he believed the registration was improper because the vehicle on which the registration was displayed was not a pick-up truck. He further testified that it is not his job to know the definitions ascribed to vehicles by the Motor Vehicles Division. Contrary to Deputy Hervol's statement, he is charged with knowing the law that he enforces, including the definitions ascribed to classes of vehicles by the motor vehicles code. *See DeGasso*, 369 F.3d at 1144 ("[The officer's] failure to understand the plain and unambiguous law he is charged with enforcing, however, is not objectively reasonable."). By stopping Defendant's vehicle based on his mistaken belief that the vehicle he observed could not be classified as a truck under the law, Deputy Hervol committed a mistake of law.

When an officer commits a mistake of law, "the dispositive inquiry" is whether the traffic law at issue provides the officer with "an objectively justifiable basis for stopping" the defendant. *DeGasso*, 369 F.3d at 1144. Deputy Hervol believed that no van could be classified as a truck under New Mexico registration law. However, as explained above, Deputy Hervol was mistaken. Any vehicle designed, used or maintained for the purpose of transporting property is

properly classified as a truck under New Mexico law. Here, the appearance of Defendant's vehicle demonstrated that it was used to conduct a mobile auto detailing business and, therefore, was used or maintained primarily for the transportation of property. Thus, Deputy Hervol did not have an objectively justifiable basis to stop Defendant.

The Government suggests that, should the Court deem Deputy Hervol's mistake one of law, the stop was justified at its inception because Deputy Hervol's mistake amounted to reasonable confusion about the details of the law. (Doc. 19 at 9). In support, the Government cites *United States v. Eckhart*, 569 F.3d 1263 (10th Cir. 2009). In that case, an officer stopped a truck at night because he was not able to read its license plate. *Id.* at 1271. The officer was incorrect as to which provision of law was violated by the license plate, but he correctly discerned that an equipment violation had occurred. *Id.* The Tenth Circuit found that the stop in *Eckhart* was justified at its inception because the officer observed a violation, though he was mistaken about the particulars of the law, because "[a]n officer need not be able to quote statutes (or scripture), chapter and verse." *Id.* at 1272. However, the Court finds *Eckhart* inapposite. Unlike in *Eckhart*, Deputy Hervol's mistake of law caused him to believe that an entirely proper registration actually constituted a violation. Deputy Hervol's mistake does not reflect merely a lack of knowledge of the precise terms of a violated statute; rather, pursuant to his mistake, Deputy Hervol could improperly seize any person driving a properly registered truck.

Even if Deputy Hervol's mistake could be construed as one of fact, the mistake would not be objectively reasonable. The question the Court must ask is whether the facts available to the officer at the time would have warranted an officer of reasonable caution to believe that the action taken was appropriate. *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir 2009) (citing *Terry*, 392 U.S. at 21-22). Undisputedly, the body of the vehicle was covered in a graphic

11

and text evidencing that it was used as a mobile auto detailing business. The primary purpose of such a vehicle is undoubtedly the transportation of property, namely, the cleaning supplies incident to operating a car detailing business.

The Court concludes that Deputy Hervol did not have reasonable suspicion or probable cause to stop Defendant's vehicle on December 11, 2012. The sole justification for the stop was a suspected registration violation. As explained above, Deputy Hervol was mistaken as to the law governing the registration of motor vehicles, and there was no reason to believe that the van's registration was false or faulty under the controlling law. Deputy Hervol's seizure of Defendant, therefore, violated the Fourth Amendment.[1]

## II.    Defendant Was Not Timely Advised of His *Miranda* Rights.

Pursuant to the Fifth Amendment, all persons have a privilege against self-incrimination. U.S. CONST. amend. V. To give practical effect to this constitutional guarantee, the Supreme Court requires that law enforcement advise persons in custody of the privilege prior to interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Statements taken during a custodial interrogation cannot be admitted at trial to establish the guilt of the accused unless the government has provided the accused with a full and effective warning of his rights at the outset of the interrogation process, and the accused has voluntarily, knowingly, and intelligently waived his rights. *Id.* at 444-45. Thus, the advisement of rights is constitutionally required only when a person is in custody and subject to interrogation. *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993).

In the instant matter, Defendant made an incriminating statement to Agent Ramirez after he had been transported to the Border Patrol station in handcuffs, after his fingerprints had been

---

[1] Because the Court concludes that the stop was not justified at its inception, it need not address the scope, or duration, of the seizure.

taken and the results had come back, while he was in a holding cell, and before he had been Mirandized. The United States concedes, as it must, that Defendant was in custody when he made an incriminating statement to Agent Ramirez. (Doc. 19 at 14 (citing *Berkemer v. McCarty*, 468 U.S. 420 (1984))). However, the Government disputes that *Miranda* warnings were required. Rather, because Defendant was subject to questioning by Border Patrol agents in relation to his immigration status, the Government contends that the questioning was administrative in nature and *Miranda* warnings were not required.

Statements are subject to exclusion if they are obtained as a result of police "interrogation." Interrogation results when there are "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Thus, interrogation includes both express and implied questioning, so long as the officer's words or actions are reasonably likely to elicit an incriminating response. *See United States v. Rambo*, 365 F.3d 906, 909 (10th Cir. 2004).

However, the Tenth Circuit has held that undocumented immigrants are not entitled to *Miranda* warnings in civil deportation proceedings. *Id.* at 469 (citations omitted). In the instant matter, the Government asserts that there existed a possibility that Defendant could have been dealt with administratively, through a civil deportation, so agents were not required to administer *Miranda* warnings. The Court does not agree. Agent Ramirez testified that, at the time he questioned Defendant, he knew that there had been a positive return showing Defendant as a previously removed aggravated felon. Thus, Agent Ramirez had reason to believe that Defendant had an aggravated felony and a previous removal, which constitute elements of the very crime

for which Defendant is being prosecuted. Furthermore, Agent Ramirez testified that criminal charges are always brought against aggravated felons who have been previously deported.

The rule applied to determine whether there is an interrogation for purposes of *Miranda* is not whether there is a criminal investigation currently underway. *See generally Mathis v. United States*, 391 U.S. 1, 4 (1968) (holding that *Miranda* warnings were required for questioning of jail inmate regarding routine "civil" tax investigation even when no related criminal prosecution was currently being pursued). As such, the fact that the agents had yet to determine whether to bring criminal charges against Defendant is not dispositive. Rather, the test is whether, under all the circumstances of the particular case, the questions asked were reasonably likely to elicit an incriminating response. Regardless of Agent Ramirez's subjective intent, the evidence shows that Agent Ramirez knew or, at the very least, should have known that his questions were reasonably likely to elicit an incriminating response that would lead to criminal charges. Given the totality of the circumstances, Agent Ramirez's failure to Mirandize Defendant prior to questioning him about his immigration status violated Defendant's Fifth Amendment rights.

This conclusion is consistent with decisions reached by other courts within the Tenth Circuit confronted with a similar issue. For example, in *United States v. Medina*, No. 07–20166–JWL, 2008 WL 2039013 (D. Kan. May 12, 2008), the court considered whether an interview of an inmate by a Border Patrol agent for purposes of determining the inmate's immigration status violated the Fifth Amendment. The Court concluded that it did, relying on the agent's knowledge that the defendant's history on an NCIC report showed that he was previously deported as an aggravated felon. *Id.* at *6-8. This is directly on point with the scenario presented in the instant

matter, and the Court similarly concludes that *Miranda* warnings were required given that Agent Ramirez had reason to believe that Defendant was a previously deported aggravated felon.[2]

### III.     The Exclusionary Rule Applies to All Evidence Gathered.

When a court finds that a defendant's Fourth or Fifth Amendment rights were violated, the ordinary remedy in the context of a criminal prosecution is the exclusion of the unlawfully seized evidence from the government's case-in-chief. *See United States v Herrera*, 444 F.3d 1238, 1248 (10th Cir. 2006) (citations omitted). The exclusionary rule is a judicially created remedy used to safeguard the rights secured by the Constitution, and it is not "a personal constitutional right of the party aggrieved." *United States v. Leon*, 468 U.S. 897, 906 (1984) (quotation omitted).

However, the exclusionary rule is not as clearly applicable to unlawfully seized evidence of identity. The Tenth Circuit permits the application of the exclusionary rule to evidence of identity, including fingerprint evidence and an A-file, only in certain circumstances. *United States v. Olivares-Rangel*, 458 F.3d 1104, 1112-13 (10th Cir. 2006). Identity evidence is subject to exclusion if it is "obtained as a result of an unconstitutional governmental investigation[,]" but it is not subject to exclusion if it is "obtained merely as part of a routine booking procedure." *Id.* at 1112. The specific purpose of the seizure and subsequent fingerprinting is the determinative factor in evaluating whether identity information is suppressible. *Id.* at 1114. Consequently, this Court is tasked with determining "whether Defendant's unconstitutional arrest was purposefully exploited in order to develop critical evidence of criminal conduct to be used against Defendant." *Id.* at 1113.

---

[2] At the conclusion of the evidentiary hearing, the United States requested a finding on the voluntariness of Defendant's statements should the Court find that a *Miranda* violation occurred. However, because the Court concludes that exclusion of all evidence is proper, *see infra*, the Court declines to make a voluntariness finding at this time. Should the Government intend to proceed in the prosecution of Defendant, the Court will make the requested finding upon the Government's motion.

There is no reason to believe that Deputy Hervol initiated Defendant's seizure for the purpose of obtaining his fingerprints. However, within minutes of the initial stop, the purpose of Defendant's ongoing detention became to identify him by taking his fingerprints. Indeed, both Deputy Hervol and Agent Meza can repeatedly be heard on the video stating that Defendant was being held and taken to the Border Patrol station to "roll" his fingerprints, which would allow the officers to obtain his identifying information and determine whether Defendant was concealing his identity. Deputy Hervol confirmed that his purpose in detaining Defendant was to obtain his fingerprints in his testimony before this Court. Because the officers' clear purpose in holding Defendant was to obtain his fingerprints, the Court concludes that the officers purposefully exploited Defendant's seizure. Therefore, Defendant's fingerprints and the information obtained as a result of rolling his fingerprints, including Defendant's A-file, are subject to exclusion.

The Court concludes that the Government has not met its burden to demonstrate that the evidence of Defendant's identity is sufficiently attenuated from Defendant's unlawful arrest so as to dissipate the taint of the initial illegality. As all evidence gathered following the stop of Defendant's vehicle, including Defendant's fingerprints, A-file and statements, amounts to fruit of the poisonous tree, the Fourth Amendment demands that it be suppressed. The Fifth Amendment violation of *Miranda* further mandates the suppression of Defendant's incriminating statement.

**THEREFORE,**

**IT IS ORDERED** that Defendant Juan Francisco Vasquez-Hernandez's Motion to Suppress (Doc. 18) is **GRANTED**.

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**

16